## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ANGELA COWELL,<br><br>      **Plaintiff,**<br><br>v.<br><br>**ILLINOIS DEPARTMENT OF HUMAN SERVICES, d/b/a Chester Mental Health Hospital, TRAVIS NOTTMEIER, JAMIA KLAUSING, and JESSICA LAWSON,**<br><br>      **Defendants.** | Case No. 3:21-CV-00478-NJR |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Along with an unprecedented pandemic, the year 2020 carried many unique workplace challenges and disruptions for Plaintiff Angela Cowell,[1] while she worked for Defendant Illinois Department of Human Services ("IDHS"). (Docs. 36; 136-1). After several promotions, Cowell assumed the Admissions Discharge Coordinator role at Chester Mental Health Center[2] ("Chester"), an IDHS facility, in August 2019. (Docs. 38, ¶ 13; 136-1, ¶¶ 2-3). Her position encompassed various responsibilities like coordinating both civil and forensic admissions from county jails and the Illinois Department of Corrections ("IDOC"), serving as a court and attorney liaison, and collaborating with

---

[1] Angela Cowell is now known as Angela Kongeal. Within this Order, the Court will refer to her as Angela Cowell as she held that name when initiating this lawsuit.

[2] Chester Mental Health Center is a mental health hospital with medium and maximum security units located in Chester, Illinois. (Doc. 120-5, ¶ 2).

administrative staff to plan, develop, and implement programs, activities, and procedures regarding admissions and discharge policies. (Doc. 120-2). From 2019 to July 2022, Cowell reported directly to Defendant Travis Nottmeier, Chester's Hospital Administrator.[3] (Doc. 120-1, pp. 11, 20). In that role, Nottmeier supervised the entire Chester facility, oversaw the budget, worked indirectly with unions, corresponded with internal and external entities, and worked closely with each department leader to ensure proper care and treatment for patients. (*Id.* at pp. 10, 22). Before reporting to Nottmeier, from 2017 to 2019, Cowell reported to Defendant Jamia Klausing, the Chief of Social Work and a Unit Director at Chester. (Doc. 120-24, p. 31). In her most recent performance review from 2021 to 2022, Cowell received positive marks and met or exceeded all expectations within her role. (Doc. 136-2).

The workplace challenges and disruptions began in early 2020 after Cowell declined to further pursue a personal, romantic relationship with Dr. Farid Karimi, Chester's Medical Director at the time. (Doc. 120-3, pp. 2-3). Karimi worked as a contractual employee not directly employed by IDHS. (Doc. 120-4, p. 69). Nevertheless, he held an important role that touched all the medical and psychiatric treatment provided at Chester. (Doc. 120-5, p. 1). In early 2020, Karimi routinely threatened and verbally abused Cowell at work. (Doc. 120-3). On June 9, 2020, a volatile incident occurred between Cowell and Karimi in Chester's parking lot. (Docs. 120-3; 120-4, p. 69; 120-22).

---

[3] Nottmeier held the role of Acting Hospital Administrator until August 2020, when he officially converted to Hospital Administrator. (Doc. 120-1, p. 20).

Fed up with this harassing behavior, Cowell submitted a formal complaint and incident report, with the help of her union representative, to Nottmeier in June 2020. (Docs. 36, ¶ 20; 120-1, p. 98). Nottmeier and Defendant Jessica Lawson, Chester's Human Resource leader, informed the Bureau of Civil Affairs ("BCA"), within IDHS, shortly after hearing Cowell's complaint. (Docs. 120-1, pp. 98-99; 120-3, pp. 8, 69-70). The BCA launched an investigation. (Doc. 120-3). The report of the investigation indicates that the BCA received the complaint on June 15, 2020. (*Id.* at p. 1). In a declaration, Cowell stated that she verbally reported sexual harassment to Nottmeier before this date. (Doc. 136-1, ¶ 23). During the investigatory period, IDHS banned Karimi from Chester's premises. (Docs. 120-1, pp. 64-65; 120-3, pp. 28-29). Despite this directive, Karimi appeared at Chester while under investigation. (Doc. 120-3, pp. 28-29). Ultimately, the BCA issued its report and recommendation finding Cowell's sexual harassment and hostile work environment claims against Karimi substantiated. (Doc. 120-3).

Aside from this troubling work environment, Cowell also suffers from disabilities including lupus, an autoimmune disease, and chronic back, neck, and spinal pain. (Docs. 120-16; 120-17; 120-18; 120-23). Her treatment for lupus involved monthly intravenous infusions performed at a hospital in St. Louis, Missouri. (Docs. 120-16; 120-17; 120-18). Beginning in 2017 and spanning into 2022, Cowell received approval for Family and Medical Leave Act ("FMLA") leave related to intermittent flareups with lupus, surgeries, and other conditions. (Doc. 120-7). IDHS required Cowell's FMLA time to run concurrently with any paid time off she accrued and used. (*Id.*).

Of course, as the history books will eventually memorialize, the Covid-19 pandemic overshadowed much of our daily lives in the summer of 2020. Chester, as a mental health hospital, fell prey to the woes of the virus and, on July 13, 2020, Nottmeier advised employees that Unit B required immediate quarantine. (Doc. 120-8). As an immunocompromised individual, Cowell understandably feared catching the life-threatening virus. (*Id.*). Nottmeier forwarded Cowell a form related to Covid-19 for potential accommodation within the facility by possibly allowing her to stay off of units with known infections. (*Id.*). In August 2020, Cowell requested to work remotely for several weeks given her need to isolate after a pre-surgery Covid-19 test, need for quarantine while recovering, and desire to avoid using paid leave or FMLA time. (Docs. 120-7; 120-10). In response, Lawson informed Cowell that Chester employees could not work remotely. (Doc. 120-10). Instead, her FMLA request was approved for the week following her surgery. (Doc. 120-7, pp. 5-12). During the same month, Cowell filed a charge of sexual discrimination, harassment, retaliation and disability discrimination with the EEOC. (Doc. 38, ¶ 29).

Two months after her surgery, Cowell requested "flextime" to attend her monthly infusion appointments beginning in October 2020. [4] (Doc. 120-11). Nottmeier denied

---

[4] The record indicates that Cowell requested a modified or alternative work assignment in July 2020, which was denied for insufficient medical documentation. (Doc. 120-9). The denial, however, does not list who denied the request or why Cowell sought the modified work assignment. (*Id.*). In response to the Amended Complaint, Defendants admitted that on or about July 21, 2020, Cowell gave Nottmeier and Lawson a Request to Work Remotely with a physician's note dated July 14, 2020, that explained Cowell's treatment for an autoimmune disease placing her at high risk for severe complications under Covid-19. (Doc. 38, ¶¶ 40-41). They still denied the request to work remotely. (*Id.* at ¶ 42).

Cowell's request for flextime citing the terms of IDHS's flextime policy and its inapplicability to Chester employees. (Docs. 120-1, p. 27; 120-12). The flextime policy, in Nottmeier's understanding, could not be used at 24/7 facilities like Chester. (Doc. 120-1, p. 26). The policy explicitly stated, however, that it did not apply to employees covered under collective bargaining agreements (like Cowell). (Doc. 120-12). As a workable solution, Lawson communicated to Cowell that she was approved for a one-day shift change from 6:00 a.m. to 2:00 p.m. to attend her infusion appointment. (Doc. 120-11). Further, Lawson instructed Cowell to resubmit the request each month and provide proof of each appointment. (*Id.*). According to Lawson, Cowell arrived 45 minutes late at 6:45 a.m. and failed to provide proof of her October appointment. (Docs. 120-13; 120-15).

Cowell renewed her request for a one-day shift change in December 2020. (Doc. 120-11). Lawson denied her request and directed Cowell to use FMLA time to cover her absences for infusion appointments. (*Id.*). The next month, Cowell again sought a one-day shift change through a documented "flextime" request. (Doc. 120-15, p. 6). Lawson informed Cowell that she submitted her request in an inappropriate manner. (*Id.* at pp. 1-2). She further admonished Cowell for failing to abide by the one-day shift change terms and provide follow-up documentation. (*Id.*). Lawson told Cowell that the one-day shift change approved in October provided a temporary solution since she ran out of FMLA leave. (*Id.*). Within two weeks of that denial, Cowell completed a Request for Reasonable Accommodation seeking the 6:00 a.m. to 2:00 p.m. shift for her monthly intravenous infusion appointments. (Doc. 120-16). The following day, Nottmeier recommended

granting the accommodation request. (Doc. 120-17). Lawson opposed. (*Id.*). She urged that FMLA leave should be used for these absences. (*Id.*).

Several weeks later, in March 2021, Cowell submitted another round of requests. (Doc. 120-18). Again, Lawson denied the flextime request. (*Id.*). Lawson relayed to Cowell that the AFSCME Union filed a grievance on her behalf at the third level. (*Id.*). For her reasoning this time, Lawson stated that, with an active grievance, she would not render any decisions with possible impact to that process. (*Id.*). Over a year later, in July 2022, an arbitrator ruled that Cowell should be permitted to submit an FMLA or Americans with Disabilities Act ("ADA") application to receive an altered work schedule. (Doc. 120-19). In addition, the arbitrator awarded Cowell 12 hours of compensatory time. (*Id.*). A month after the arbitration decision, Cowell submitted another request for a workplace accommodation with flextime along with a Reasonable Accommodation Request for a one-day shift change each month for her infusion treatments without sacrificing limited FMLA leave, sick time, or vacation time. (Docs. 120-20; 120-21). Her immediate supervisor at that time, non-party Director of Social Work Angela Quigley-Ragland, recommended approval of the request for reasonable accommodation. (Docs. 120-1, pp. 10-11; 120-21). Aligning with her pattern thus far, Lawson opposed the reasonable accommodation request explaining that employees accumulate benefit time, sick time, and compensatory time to use for illness and treatments, and specific to Cowell, she could also use her FMLA time. (Doc. 120-21). To justify her opposition, Lawson also referenced Administrative Directive 01.02.02.280 Flexible Work Schedule—the same one cited by

Nottmeier in his initial denial two years earlier. (*Id*.). Using the same logic as Nottmeier, Lawson stated that the flextime policy excluded employees in 24/7 facilities. (*Id*.). In 2020 and 2022, Cowell exhausted her paid benefit time and used unpaid FMLA leave. (Doc. 120-5). The use of unpaid time caused a slight decrease in her annual pay. (*Id*.).

Along with her monthly shift change for infusion treatments, Cowell also sought a workplace accommodation for her cervical disc disorder and chronic neck and back pain. (Doc. 120-23). Rewinding back to July 2020, Cowell submitted a request for a standing desk. (Doc. 120-4, pp. 25-33). Cowell completed the required packet, then Lawson and Nottmeier completed their portion of the forms. (*Id.* at p. 59). Both Lawson and Nottmeier recommended the approval of the standing desk request. (Doc. 120-23). Lawson then forwarded the request to the Bureau of Accessibility and Job Accommodation ("BAJA"), a division of IDHS. (Doc. 120-4, p. 59). An investigator looking into Cowell's 2020 EEOC complaint emailed Nottmeier and Lawson to see if BAJA received and approved this request in November 2020. (Doc. 120-13). To check the status, Lawson sent a follow-up email to BAJA at that time. (*Id*.). In December 2020, BAJA denied Cowell's standing desk request and offered her an ergonomic chair instead. (Doc. 120-23, p. 3). At Lawson's direction, Cowell appealed the decision, which BAJA granted in March 2021. (Docs. 120-4, p. 55; 120-23, pp. 4, 12). She received a standing desk at the end of that month, eight months after her initial request. (Doc. 120-6, ¶ 12).

In tandem with the arduous accommodation process, Cowell felt mistreated in several ways by her coworkers and supervisors. Around the time she submitted her

formal sexual harassment complaint against Dr. Karimi, Cowell noticed that Klausing, Cowell's former supervisor and Chief of Social Work, left her off of meeting invitations. (Docs. 120-24, pp. 31-33). According to Cowell, Klausing excluded her from three to four meetings from June or July 2020 to January 2021. (*Id.*). Cowell emailed Klausing to confront her about this ongoing issue and secure future invitations to the relevant meetings. (*Id.* at pp. 63-66; 120-25). Cowell suspected that Klausing intentionally excluded her from these meetings. (*Id.*).

In January 2022, Cowell took a leave of absence. (Doc. 120-1, p. 57). At that time, Nottmeier reassessed which positions required state-issued cell phones and determined that Cowell's position fell off that list along with others. (*Id.* at p. 55). All calls to her formerly supported cell phone rerouted to another number, and she could only be contacted by desk phone or pager. (*Id.* at pp. 55-57). In February 2022, Nottmeier forced Cowell to surrender her state-issued cell phone. (Doc. 136-1, ¶ 7). In summer of 2022, Nottmeier reinstated Cowell's state-issued encrypted cell phone to fulfill her responsibilities of responding to emails and answering calls related to recent motions filed in court and handling sensitive medical information through calls and emails. (Docs. 120-1, pp. 57-60; 136-1, ¶¶ 11-12). While without a work cell phone, Cowell missed an important call, which purportedly frustrated a Cook County Judge. (Doc. 136-1, ¶¶ 13-19). The judge ordered her to appear in court or risk being held in contempt. (*Id.*).

Cowell believes all these actions—the flextime request denials, the forced use of her limited FMLA time, the initial standing desk denial and long waiting period, the

rescinding of her encrypted state-issued cell phone, her lower pay due to lack of accrued paid leave, and exclusion from emails and meetings—occurred out of retaliation for filing a complaint against Dr. Karimi for sexual harassment, requesting disability accommodations, and submitting a charge of sexual and disability discrimination with the EEOC.

In this action, Cowell proceeds against IDHS on three counts: (1) Count I for Sexual Discrimination and Retaliation in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.; (2) Count II for Disability Discrimination in violation of the ADA, 42 U.S.C. § 12101, *et seq*.; and (3) Count III for interference of benefits under the FMLA, 29 U.S.C. § 2601, *et seq*. (Doc. 36). Cowell also brings Count III against Nottmeier, Lawson, and Klausing. (*Id*.). Finally, in Count IV, Cowell sues Nottmeier, Lawson, and Klausing for Intentional Infliction of Emotional Distress under Illinois law.

Defendants now move for summary judgment on all counts. (Docs. 119; 120; 139). Cowell opposes the motion and argues that several genuine issues of material fact exist for resolution at trial. (Doc. 136).

## LEGAL STANDARD

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Assertions that a fact cannot be or is genuinely disputed must be supported by materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions,

interrogatory answers, or other materials. FED. R. CIV. P. 56(c)(1). Once the moving party

sets forth the basis for summary judgment, the burden then shifts to the nonmoving party

who must go beyond mere allegations and offer specific facts showing that there is a

genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317,

323-24 (1986). In determining whether a genuine issue of fact exists, the Court must view

the evidence and draw all reasonable inferences in favor of the non-movant. *Bennington*

*v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 255 (1986). Notably, summary judgment standards are applied with greater

scrutiny in employment discrimination cases as intent and credibility are crucial issues.

*Silk v. City of Chicago,* 194 F.3d 788, 798 (7th Cir. 1999).

DISCUSSION

I.   **Count I – Sexual Discrimination and Retaliation against IDHS in Violation of Title VII**

   a.   **Discrimination**

Title VII renders unlawful an employer's discrimination "against any individual

with respect to [his or her] compensation, terms, conditions, or privileges of employment,

because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.

§ 2000e-2(a)(1). "[A] plaintiff may establish a violation of Title VII by proving that

discrimination based on sex has created a hostile or abusive work environment." *Meritor*

*Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). To substantiate a claim of sexual

harassment based on hostile work environment, a plaintiff must show that: (1) she was

subjected to unwelcome sexual conduct, advances, or requests; (2) because of her sex;

(3) the conduct was severe or pervasive enough to create a hostile work environment; and (4) there is a basis for employer liability. *Lapka v. Chertoff*, 517 F.3d 974, 982 (7th Cir. 2008). An employer faces liability for "sexual harassment by nonsupervisory employees only when it has actual or constructive knowledge of the harassment." *Volk v. Coler*, 845 F.2d 1422, 1436 (7th Cir. 1988). An employer with such knowledge of the harassment must promptly respond with investigation and appropriate remedial action reasonably likely, under the circumstances, to prevent the conduct from recurring. *Lapka*, 517 F.3d at 984-85.

Here, IDHS does not contest that Cowell can satisfy the first three elements of the sexual harassment claim. Thus, IDHS focuses solely on the fourth element—the basis of its liability for sexual harassment by a nonsupervisory employee. IDHS emphasizes that Cowell complained to her immediate supervisor, Nottmeier, in June 2020 after an incident in the parking lot with her harasser Dr. Karimi, Chester's Medical Director and Cowell's coworker. After receiving this complaint, Nottmeier and Lawson forwarded the allegations to the BCA. Immediately, the BCA launched an investigation, and Karimi was barred from entering Chester. When the BCA substantiated the allegations and concluded its investigation, Karimi resigned and never returned to work at Chester. Cowell contends, however, that during the investigation, as admitted by IDHS, Karimi violated this ban and returned to Chester. Because IDHS did nothing to ensure that Karimi stayed away, Cowell argues IDHS failed to uphold its obligation to provide a non-hostile work environment for her and to take action reasonably likely to prevent the

conduct from recurring. Cowell urges that a jury should decide whether IDHS failed to take immediate and appropriate action when it merely ordered Dr. Karimi to stay away during its investigation.

Prompt investigation into the alleged misconduct is the "hallmark of a reasonable corrective action." *Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 954 (7th Cir. 2005). While Title VII does not necessitate that an employer's response successfully prevent subsequent harassment, the efficacy of an employer's remedial action is material in determining whether the action was reasonably likely to prevent the harassment from recurring. *Id.* Here, there is no doubt that IDHS promptly and thoroughly investigated Cowell's complaints. The incident that motivated Cowell to report Karimi's conduct occurred on June 9, 2020. It is unclear the exact date that Cowell met with Nottmeier and her union representative to formally file her complaint, but the BCA investigation documentation shows that it received the complaint on June 15, 2020, less than a week after the actual incident. Along with the investigation, IDHS took further remedial action and banned Karimi from Chester's premises.

Karimi ignored this order, which is undisputed. But the record is devoid of evidence that any harassment continued when Karimi returned to Chester in violation of the ban. At most, Cowell states that she reported Karimi's presence to Chester's security staff and that IDHS did nothing to prevent Karimi from returning to Chester while banned. Even construing all facts in favor of Cowell, there is no evidence that IDHS's efforts failed to prevent the harassment from recurring. It is unclear how many times he

returned to the property, for how long, and how Chester security handled his presence. In any event, the facility ban may have failed, in and of itself, at preventing Karimi from returning to Chester, but no specific facts demonstrate Karimi continued to harass Cowell during the investigation or even that they interacted when he showed up at Chester. Cowell's response to the motion for summary judgment indicates that Karimi returned to Chester and cornered and threatened her while banned from the facility. (Doc. 136, p. 14). But the paragraphs from Cowell's declaration cited in support of this assertion merely reference the inciting incident from June 9, 2020, not any new instance of harassment after Karimi was banned from the premises.

The steps taken by IDHS demonstrate that it regarded Cowell's harassment allegations as serious and effected appropriate action to end the harassment. Without any evidence to the contrary, it appears that no other incidents of harassment occurred after Cowell reported the June incident to Nottmeier. On this record, no reasonable trier of fact could conclude that IDHS exhibited negligence in investigating or responding to the reported harassment. Thus, IDHS is entitled to summary judgment as to the sexual harassment claims under Title VII in Count I.

### b. Retaliation

Title VII also prohibits retaliation against employees who engage in protected activity under the Act. 42 U.S.C. § 2000e-3(a). "Employers are prohibited from punishing employees for complaining about discrimination or other practices that violate Title VII." *Sitar v. Indiana Dep't of Transportation,* 344 F.3d 720, 727 (7th Cir. 2003). An employee-

plaintiff can establish a prima facie case of retaliation under either the direct or indirect method. *Roney v. Illinois Dep't of Transportation*, 474 F.3d 455, 459 (7th Cir. 2007).

To establish a claim of retaliation under Title VII using the direct approach, a plaintiff must show: (1) she engaged in a statutorily protected activity, (2) her employer took a materially adverse action against her, and (3) the protected activity was the but-for cause of the adverse action. *Mollet v. City of Greenfield*, 926 F.3d 894, 896 (7th Cir. 2019). Alternatively, under the indirect approach, the plaintiff must show that: (1) she engaged in a statutorily protected activity; (2) she performed her job within her employer's legitimate expectations; (3) despite satisfactory job performance, she suffered an adverse action from the employer; and (4) she experienced less favorable treatment than similarly situated employees who did not engage in statutorily protected activity. *Sitar*, 344 F.3d at 728. Once these elements are proven, the burden shifts to the defendant-employer to produce a legitimate, non-invidious reason for the adverse action. *Id.* If the employer provides such a reason, the burden shifts back to the employee to show that the reason is pretextual. *Id.* Under either approach, the principal question is whether the evidence, as a whole, "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

As to retaliation, IDHS acknowledges that Cowell engaged in statutorily protected activity by reporting workplace sexual harassment and filing an EEOC charge. IDHS argues that Cowell cannot establish that she suffered a materially adverse action or that

her report of sexual harassment caused any such action. According to IDHS, the actions alleged by Cowell—retaliatory denial of her accommodation requests, lost wages and other economic benefits, loss of her state-issued cell phone—do not rise to the level of a materially adverse action. Additionally, IDHS highlights the lack of causal connection between Cowell's sexual harassment complaint and the purported adverse actions. Even if the burden eventually shifts, IDHS argues that Cowell's requests for flextime were prohibited by its own policy which is a legitimate, non-discriminatory rationale for its actions. Moreover, IDHS emphasizes that Cowell provides no similarly situated employee who enjoyed more favorable treatment. In response, Cowell identifies only one example of possible retaliation—the removal of her state-issued cell phone. She argues that retaliatory motive can be established through circumstantial evidence like suspicious timing, ambiguous statements, and other evidence which produces an inference of discriminatory intent. Cowell asserts that Nottmeier's intent in rescinding her phone, whether retaliatory or not, should be decided by a jury.

Under either the direct or indirect method, Cowell cannot establish a prima facie case for retaliation under Title VII. As an initial matter, the Court agrees with IDHS that the purported actions taken against Cowell do not qualify as materially adverse. An action may be considered materially adverse if it could dissuade a reasonable worker from making or supporting a charge of discrimination. *Lapka*, 517 F.3d at 985-86. Certainly, not every workplace decision or occurrence that upsets an employee is an actionable adverse action. *Id.* at 986. An adverse employment action materially and

adversely changes the terms and conditions of employment at a level more disruptive than a mere inconvenience or an alteration of job responsibilities. *Alamo v. Bliss,* 864 F.3d 541, 552 (7th Cir. 2017). Some examples of materially adverse actions include termination, demotion through decrease in wage or salary, reduction of long-term career prospects, less distinguished title, material loss of benefits, significantly diminished material responsibilities, and altered working conditions that create humiliation, degradation, unsafety, or a negative work environment. *Lapka,* 517 F.3d at 986; *Alamo*, 864 F.3d at 552.

According to the available evidence, Cowell suffered no such action. Denial of her requests for flextime and to work remotely during the pandemic do not rise to the level of an adverse employment action. These were not privileges Cowell enjoyed before reporting sexual harassment that were later taken away or altered. In fact, the record indicates that no other Chester employees received approval to work remotely or adjust their schedules. While Defendants appear to admit in their answer that "[d]efendants allowed others without disabilities to work remotely" (Doc. 38, ¶ 50), this vague admission fails to reveal whether other employees *at Chester* could work remotely (IDHS encompasses more than one facility and division). All other evidence in the record demonstrates that no Chester employee received permission to work remotely at that time. Cowell offers no evidence as to whether any of these purported employees were similarly situated to her, where they worked, what roles they held, or any other necessary information to determine whether Cowell was treated differently. Cowell argues that the repeated denial of her ADA accommodation requests amounts to adverse action. To treat

these denials as adverse actions in the retaliation context would be duplicative of her failure to accommodate claim. That claim covers the consequences of these denials and whether such denials were legitimate.

As for the other possible adverse actions, Cowell asserts that her pay decreased because she was forced to take unpaid leave. This is an indirect consequence of utilizing her FMLA benefits—not an adverse employment action taken against her by IDHS or its employees. If construed as a materially adverse action, this slight loss in pay amounts to the ultimate long-game method of retaliation with a fairly innocuous result. That leaves the loss of her state-issued cell phone as the last potential adverse action—the only retaliatory action addressed by Cowell in her response to Defendants' motion for summary judgment. The record shows that Cowell lost her encrypted state-issued cell phone in January 2022 for about six months. This cannot reasonably be considered the kind of action that would dissuade an employee from making or supporting a charge of discrimination. *See Place v. Abbott Laboratories*, 215 F.3d 803, 810 (7th Cir. 2000) ("Some of her complaints—losing her telephone and cubicle—are too trivial to amount to an adverse employment action."). While the lack of cell phone disrupted Cowell's ability to perform her duties outside of the office, she still had the appropriate equipment in the office to correspond with courts and attorneys and perform her primary responsibilities. This lone action simply does not rise to the level of a materially adverse employment action.

Even if these actions could be considered materially adverse, Cowell fails to demonstrate or create an inference of a causal connection to her complaint of sexual harassment. Using the direct method, Cowell must show that her complaint of sexual harassment acted as the but-for cause for the adverse action. She offers no direct evidence of causation or intent. As for circumstantial evidence, she fails to point to evidence like suspicious timing, ambiguous statements, or any other kind of support evidence that creates an inference of causation or intent. Her requests to work remotely occurred two months after the initial complaint for sexual harassment due to the prominence of Covid-19 and her need to isolate for surgery. IDHS denied this request before Cowell filed a charge with the EEOC. To causally connect this denial with the initial complaint of harassment, Cowell cannot reasonably argue suspicious timing given the two months between the initial complaint and her denied request. IDHS denied her remote work request but allowed her to take FMLA leave to isolate before and recover from the surgery. Her next request for a one-day adjusted schedule came in October 2020, and that request received approval. The subsequent denials of her requests for an adjusted schedule occurred in December 2020, six months after her initial complaint and four months after she filed an EEOC charge. These facts do not create an inference of suspicious timing or causal connection between Cowell's protected activity under Title VII and her denied request for a one-day shift change. For the removal of her state issued cell phone, the causal connection is even more tenuous. The decision to take away her

phone occurred in January 2022, a year and a half after Cowell reported sexual harassment.

Within the indirect framework, after substantiating an adverse action, Cowell must establish that she performed her job within her employer's legitimate expectations, and she experienced less favorable treatment than similarly situated employees who did not engage in statutorily protected activity. Although the record contains only one performance review, we can assume Cowell performed her job within IDHS's legitimate expectations. There is no argument to the contrary. Even if Cowell had suffered an adverse action, she does not identify any evidence that she experienced less favorable treatment than similarly situated employees who did not engage in protected activity. She also does not name any other employee who received approval to work remotely, adjust their schedule, or keep their previously provided cell phone. As discussed above, the record indicates that no other Chester employee, let alone an employee with a similar role to Cowell, received permission to work remotely during the relevant time. As for the cell phone privileges, Nottmeier testified that he stripped other positions of a state-issued cell phones as well.

For all of these reasons, no reasonable jury could determine that IDHS took any materially adverse employment action against Cowell after she complained of sexual harassment. Moreover, Cowell fails to make a prima facie case beyond establishing a materially adverse action through either the direct or indirect method. Examining the evidence as a whole, IDHS is entitled to summary judgment on the retaliation claims

under Title VII in Count I. Thus, summary judgment is granted in favor of IDHS on Count I in its entirety.

## II.     Count II – Disability Discrimination against IDHS in violation of the ADA

Cowell claims that IDHS failed to make reasonable accommodations for her disabilities under the ADA. The ADA prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). An employer must be willing to consider making changes to its work rules, facilities, terms, and conditions to enable a disabled individual to work. *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). To establish a claim for failure to accommodate under the ADA, a plaintiff must demonstrate that: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate that disability. *Preddie v. Bartholomew Consolidated School Corp.*, 799 F.3d 806, 813 (7th Cir. 2015). The ADA defines "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.*; 42 U.S.C. § 12111(8). Further, the term "reasonable accommodation" may include making facilities accessible, job restructuring, part-time or modified work schedules, reassignment to vacant positions, acquisition or modification of equipment or

devices, and other similar accommodations for individuals with disabilities. 42 U.S.C. § 12111(9).

IDHS claims that, pertaining to her remote work requests, Cowell cannot be considered a qualified individual under the ADA because working onsite, full-time was an essential function of her job. As for the standing desk accommodation, IDHS urges that its relatively short delay in delivering a standing desk to Cowell does not support a failure to accommodate claim. Further, for all her reasonable accommodation requests, Defendants argue that the ADA only entitles qualified individuals to *reasonable* accommodation, not *preferred* accommodation.

Cowell asserts that she suffers from a disability covered by the ADA, namely lupus and a spinal disc disorder with chronic back pain. With her disability, Cowell contends that she is a qualified individual under the ADA because she can perform the essential functions of her job with or without reasonable accommodation. Cowell argues that she has a valid claim against IDHS for failing to reasonably accommodate her under the ADA because IDHS denied her modest request for a modified work schedule once per month and her request to work remotely during the pandemic given her immunocompromised status. Cowell emphasizes that the job description for her role lacked an onsite, full-time requirement. Cowell also argues that the ADA explicitly lists a modified schedule as a potential reasonable accommodation.

Here, three relevant accommodation requests are at issue: a modified work schedule once a month to attend infusion appointments, a temporary (up to five weeks)

remote work schedule during the pandemic considering Cowell's autoimmune disease and impending surgery, and a standing desk. IDHS's motion for summary judgment states that Cowell "was allowed to flex her time in order to attend appointments however was not allowed to work remote." (Doc. 120). While it is true that Cowell never received permission to work remotely, her requests for a modified schedule were approved on only one documented occasion in October 2020. IDHS denied her other requests for a modified schedule one day per month and communicated to Cowell that her FMLA benefits could cover her absences for infusion treatments. Cowell requested a standing desk and received a denial five months later with an alternative accommodation of an ergonomic chair. She eventually received a standing desk three months after the initial denial.

IDHS appears to accept that Cowell suffers from a disability covered by the ADA. Cowell also made IDHS aware of her disabilities. There is no contention that Cowell lacked the necessary skills and certifications for her position. Thus, two issues remain: whether Cowell was a qualified individual and whether IDHS failed to reasonably accommodate her disabilities.

To determine if an employee is a qualified individual, courts "first consider whether the individual satisfies the prerequisites for the position and then turn to the question of whether the individual can perform the essential functions of the job with or without reasonable accommodation." *Smithson v. Austin*, 86 F.4th 815, 820 (7th Cir. 2023). Within this analysis, courts must contemplate whether a particular duty is an essential

function of the job. *Id.* This inquiry involves many considerations including "the employer's judgment, the employee's written job description, the amount of time the employee spends performing that function, the consequences of not requiring the employee to perform the function, and the experiences of past and current workers." *Id.* The employer's opinion is considered, but not afforded complete deference. *Kinney v. St. Mary's Health, Inc.*, 76 F.4th 635, 644 (7th Cir. 2023).

Cowell sought a modified schedule to work from 6:00 a.m. to 2:00 p.m. (instead of 8:00 a.m. to 4:00 p.m.) one day per month to attend infusion treatments for lupus. IDHS failed to address its repeated denial of this requested accommodation. After working with Cowell once to approve this accommodation, the record indicates that IDHS gave her the run-around as to why she could not receive this accommodation again. The reasons for denial seemed to change each time. In one instance, Cowell was told to use her available FMLA leave. In another, Cowell purportedly submitted her request inappropriately, failed to adhere to the agreed start and stop time, and failed to supply the proper follow-up documentation. On one occasion, IDHS denied her request because Cowell's union had a pending grievance. In yet another excuse, IDHS pointed to its official flextime policy as a reason for denial. Chester's HR coordinator, Lawson, also communicated to Cowell that "a request for a one day shift change" lies solely within "the discretion of the Hospital Administrator and is not done frequently." (Doc. 120-15, p. 2).

Nottmeier stated that because some staff are not in the building from 6:00 a.m. to 8:00 a.m. and courts are typically closed at the time, there may be some tasks Cowell could not handle during those hours, but other tasks could likely be performed earlier, like reading and responding to emails. (Doc. 120-1, pp. 38-41). He also asserted that occasionally emergency transfer calls and court communication arose late in the afternoon, which may have required her attention. (*Id.* at 41). The job description for Cowell's role at the time included duties of coordinating both civil and forensic admissions from IDOC and county jails to Chester. Cowell served as a liaison between the courts, public defenders, and state's attorneys. In her role, she communicated with the Hospital Administrator, Assistant Facility Director, Unit Directors, Business Administrator and other administrative staff to plan, develop, and implement programs, procedures, and activities regarding admission and discharge policies. Her job also required that she work as a supervisor providing guidance and training to her assigned staff and that she travel in performance of her job duties. She also reviewed and corrected reports by treatment staff. The Admissions and Discharge Coordinator role further entailed assessing referrals for admission to decide if Chester provided the correct environment for a patient and setting up video conferences with other facilities for recommended transfers. Until January 2022, Cowell had an encrypted phone that she routinely used to communicate with courts and complete other required tasks both in and away from the office.

From this record, the Court cannot say that in-person attendance from 2:00 p.m. to 4:00 p.m. once a month was an essential function of Cowell's job. Cowell's requested accommodation shifted her schedule one day per month to work from 6:00 a.m. to 2:00 p.m. instead of 8:00 a.m. to 4:00 p.m. While Nottmeier contends that some functions of Cowell's role could not be completed from 6:00 a.m. to 8:00 a.m., he concedes that other tasks could be performed in the early morning hours. Her job description detailed many tasks that could be prioritized in the morning hours of the adjusted schedule so that other tasks, such as coordinating with Chester staff and courts, could be accomplished during the rest of the day. Nottmeier also stated that certain emergency situations occasionally required Cowell's attention in the afternoon, but emergency situations could arise outside her normal work hours or at any time during the day. Cowell asserts that she often worked during her infusion appointments through the use of her encrypted phone. On this record, a reasonable jury could find that Cowell could fulfill the essential requirements of her job with or without this reasonable accommodation, and thus, that Cowell is a qualified individual.

As outlined above, a modified work schedule is specifically imagined as a reasonable accommodation under the ADA. While IDHS provided this accommodation to Cowell once, it failed to do so, apparently for various reasons, on the other occasions requested by Cowell. The Court agrees with Cowell that a genuine question of material facts exists as to whether IDHS failed to reasonably accommodate her with a modified schedule one day per month.

Cowell's request to temporarily work remotely presents a thornier inquiry. Historically, the Seventh Circuit has held that, in general, working at home is not a reasonable accommodation. *See Kinney*, 76 F.4th at 644 (collecting cases). Moreover, employers generally may require in-person attendance as an essential requirement of a job. *Smithson*, 86 F.4th at 820-21. But with the advent of technology and the Covid-19 pandemic which led to telework advancements, assessing whether in-person attendance is an essential function of a job requires context-specific analysis. *Id.* at 822.

During his deposition, Nottmeier conceded that "there's a lot of functions of [Cowell's] job that could likely be completed remotely, but there are other job duties that are essential in terms of needing to meet with staff here locally. Coordinating patient care, et cetera." (Doc. 120-1, p. 61). Nottmeier acknowledged helpful technologies enable remote work like WebEx and Zoom but stated that access to electronic medical records would require onsite staff to do more work. (*Id.* at pp. 63-64). He also testified, as did Lawson, that IDHS deemed all Chester staff "essential" at the beginning of the pandemic and required all employees to be onsite. (*Id.* at pp. 62-63; Doc. 120-4, pp. 32-33). That administrative directive is not in the record.

The Court finds that a genuine issue of material facts exists as to whether in-person attendance was an essential function of her job, especially during the short four to five week period she requested to telework. By July 2020, when Cowell requested to work remotely, the pandemic had been raging for several months. As Nottmeier admitted, technologies like WebEx and Zoom created the ability to meet virtually. Nottmeier

testified that coordinating patient care required staff to meet locally, but that's the only requirement he outlined. Cowell's job description did not mention coordinating patient care, only coordinating admissions and discharge for the facility. Nottmeier and Lawson also stated that no Chester employee could telework as they were deemed "essential" by IDHS during the pandemic. Any such official announcement is not in the record, and classifying employees as "essential" in the context of the pandemic is a different matter entirely from in-person attendance being an essential function of Cowell's job. IDHS contends that Cowell's job required her to access physical patient files, which could not be effectively handled remotely. The only support in the record for this assertion comes from Nottmeier's deposition. Nottmeier conceded that onsite staff could scan and send records to Cowell, but that such tasks would create "a little more work" for onsite staff and "make it a little bit more cumbersome." (Doc. 120-1, pp. 63-64). Certainly, Cowell's job description outlines several essential functions of her job that involve coordination with employees at Chester such as supervising direct reports and coordinating with the hospital administrator. IDHS fails to explain why this communication could not occur through virtual means for a temporary period.

On the other hand, Cowell asserts that she routinely worked remotely from her encrypted cell phone. Moreover, her job description details that she primarily coordinated with courts, attorneys, and other facilities, which already entailed communication via phone, email, and other remote communication methods. The record also indicates that onsite meetings often had a WebEx component. Although this

evidence that Cowell could perform the essential functions of her job with a remote work accommodation might not ultimately convince a jury, the Court cannot weigh conflicting evidence or make credibility determinations at the summary judgment stage. *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011). Nor can the Court say that, as a matter of law based on this record, Cowell's job necessitated in-person attendance, and temporary remote work would not suffice as a reasonable accommodation.

As for the final accommodation, Cowell requested a standing desk on July 10, 2020. Lawson and Nottmeier recommended this accommodation for Cowell's chronic back pain and disc replacement in her neck and spine. By November 2020, BAJA, a division of IDHS, had not rendered any decision, which prompted Lawson to reach out on Cowell's behalf. In December 2020, nearly five months later, BAJA denied Cowell's request and instead approved an ergonomic chair as an alternative accommodation, which Cowell appealed at Lawson's direction. BAJA granted the appeal on March 8, 2021, and Cowell received a standing desk later that month—eight months after her initial request.

"An unreasonable delay in providing an accommodation for an employee's known disability can amount to a failure to accommodate [her] disability[.]" *McCray v. Wilkie*, 966 F.3d 616, 621 (7th Cir. 2020). The reasonableness of a delay turns on the totality of the circumstances. *Id.* A non-exhaustive list of factors to consider includes the employer's good faith in attempting to accommodate the disability, length of the delay,

reasons for the delay, the nature, complexity, and burden of the accommodation, and whether the employer offered alternative accommodations. *Id.* Employers and employees must engage in a flexible interactive process making a good faith effort to determine the appropriate and necessary accommodations. *Yochim v. Carson*, 935 F.3d 586, 591 (7th Cir. 2019). "A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith." *Beck*, 75 F.3d at 1135.

The undisputed facts demonstrate that BAJA took five months to render an initial response to Cowell's accommodation request, which only occurred after a follow-up email from Lawson. According to Lawson's testimony, BAJA, by policy, typically processed requests in 35 business days. (Doc. 120-4, p. 17). She also testified that IDHS had a procurement department to handle these types of equipment-based requests. (*Id.* at pp. 16-17). The request itself was not complicated nor was the attached medical documentation. A reasonable jury could determine that Cowell's request for accommodation fell on deaf ears for at least five months, well beyond the standard 35 business days. IDHS offers no reason for this delay. Of course, BAJA may have simply made a mistake in failing to process Cowell's request in a timely manner. But an inference could be made that IDHS exhibited bad faith in attempting to accommodate Cowell. Moreover, BAJA resolved the request only after Lawson sent a follow-up email. A jury could infer that BAJA resolved the request haphazardly, as it rendered a decision within two weeks of Lawson's reminder email with an inadequate alternative. The overturned

decision after Cowell's appeal reinforces this inference. Thus, when the Court construes the facts in the light most favorable to Cowell, as it must, Cowell's failure to accommodate claim regarding the standing desk cannot be resolved on summary judgment. A reasonable jury could find that IDHS created an unreasonable delay in responding to Cowell's request and ultimately delivering an appropriate accommodation.

Lastly, to the extent that Cowell argues retaliation under the ADA, denial of her requests for accommodation cannot be the basis of that claim. Such a claim would be duplicative of her failure to accommodate claim. *Moore-Fotso v. Bd. of Educ. of the City of Chicago,* 211 F. Supp. 3d 1012, 1037-38 (N.D. Ill. 2016) (collecting cases). Otherwise, the allegations would be circular where the denial of an ADA request could be considered unlawful retaliation for the act of making the request. *Id.* at 1038. Aside from IDHS refusing to allow Cowell to telework or adjust her schedule or its delay in delivering a standing desk, Cowell points to the removal of her encrypted cell phone as an example of retaliation. Just as discussed above with retaliation under Title VII, this action does not qualify as an adverse employment action. Even if it did, Cowell offers no direct or circumstantial evidence of a causal relationship between removal of her phone and her EEOC complaint alleging disability discrimination or accommodation requests. The removal of her phone occurred in January 2022, well over a year after the EEOC complaint, remote work request, and standing desk request, and several months after her requests for a modified schedule. Cowell cannot reasonably allege suspicious timing on these facts. She also offers no evidence to support an inference of retaliatory

intent. Thus, to the extent Cowell alleges unlawful retaliation under the ADA in Count II, that portion of the claim is dismissed.

### III.    Count III – FMLA Interference against IDHS, Travis Nottmeier, Jamia Klausing, and Jessica Lawson

It is unlawful for employers to interfere with, restrain, or deny an employee's exercise or attempted exercise of their rights under the FMLA. 29 U.S.C. § 2615(a)(1). To substantiate an FMLA interference claim, a plaintiff-employee must show that: "(i) he was eligible for the FMLA protections; (ii) [the employer] was covered by the FMLA; (iii) he was entitled to leave under the FMLA; (iv) he provided sufficient notice of his intent to take leave; and (v) [the employer] interfered with, restrained, or denied FMLA benefits to which he was entitled." *Ziccarelli v. Dart*, 35 F.4th 1079, 1089 (7th Cir. 2022). Unlawful interference encompasses using an employee's exercise of FMLA leave as a negative factor in employment actions and discouraging an employee from taking such leave. *Preddie*, 799 F.3d at 818. To recover for such a violation, the plaintiff-employee must also demonstrate that he suffered prejudice by the unlawful actions of his defendant-employer. *Id.*

Defendants argue that Cowell's theory under Count III is flawed. Cowell alleges that Defendants interfered with her FMLA leave by forcing her to use her limited FMLA time instead of allowing her to modify her schedule. But Defendants contend that they never denied Cowell's request to use FMLA leave, nor did they dissuade her from taking FMLA leave or consider her FMLA leave as a negative factor in employment actions. On the contrary, they encouraged Cowell to use FMLA leave rather than opting for a

different accommodation. Cowell argues that FMLA prohibits denial, restraint, *or* interference of FMLA time. She does not argue that Defendants denied or restrained her FMLA leave, only that Defendants interfered with her leave by pushing her to use her limited, precious FMLA leave instead of offering a more flexible accommodation that did not require the depletion of such leave.

As an initial matter, Cowell raises this claim against all Defendants—IDHS, Travis Nottmeier, Jessica Lawson, and Jamia Klausing. IDHS, Nottmeier, and Lawson made decisions regarding Cowell's modified schedule requests and whether she could take FMLA leave. The Court cannot find any connection in this claim to Klausing. At the relevant time, Klausing was not Cowell's supervisor and did not make any decisions, or even comments, about Cowell's FMLA leave. As such, Klausing is immediately dismissed on Count III. Next, Cowell's ADA failure to accommodate claim also subsumes this claim. At its core, this FMLA interference claim is really a failure to accommodate claim, in which Cowell argues that another consequence of IDHS's failure to accommodate included the sacrifice of limited FMLA leave. Further, under the FMLA, an employer has no obligation to assist an employee in avoiding the use of limited FMLA leave. An employer is only obligated to allow eligible employees to take up to 12 weeks of unpaid, job-protected leave for serious health conditions during any 12-month period. 29 U.S.C. § 2612. Cowell does not point to any evidence in the record showing that, after she provided sufficient notice of her intent to take FMLA leave, Defendants denied her requests for FMLA leave or that they discouraged or dissuaded her from taking such

leave to which she was entitled. This is fatal to Cowell's FMLA interference claim. Thus, all Defendants are entitled to summary judgment on Count III.

### IV. Count IV – Intentional and/or Reckless Infliction of Emotional Distress against Travis Nottmeier, Jamia Klausing, and Jessica Lawson

Under Illinois law, three elements are necessary to substantiate a claim of intentional infliction of emotional distress: (1) extreme and outrageous conduct by the defendant, (2) either intent to cause distress or knowledge of a high probability that the defendant's own conduct will cause severe emotional distress, and (3) that severe emotional distress actually resulted. *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (2003); *see also Dixon v. County of Cook*, 819 F.3d 343, 351 (7th Cir. 2016). To constitute extreme and outrageous conduct, a defendant's actions must be so extreme as to go beyond all possible bounds of decency, which would be regarded as intolerable in a civilized society. *Feltmeier*, 798 N.E.2d at 81 (citing *Kolegas v. Heftel Broadcasting Corp.*, 607 N.E.2d 201 (1992)). Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities will not suffice to substantiate this claim. *Trahanas v. Northwestern Univ.*, 64 F.4th 842, 859-60 (7th Cir. 2023). "Illinois sets a high bar for intentional infliction of emotional distress claims." *Id.* at 859. Liability for emotional distress becomes even more constrained in the employment context. *Id.* at 860. To obtain relief in the employment context, an employee must demonstrate that an employer clearly abused the power held over an employee in a way far more severe than typical disagreements or job-related stress present in an average work environment. *Id.*

Defendants Nottmeier, Lawson, and Klausing argue that Cowell cannot

substantiate any element of this claim—that any of their conduct qualifies as extreme and outrageous, that they acted with the required intent, or that severe emotional distress resulted. Alternatively, Cowell argues that Defendants knew she was a disabled individual who also recently suffered sexual harassment in the workplace. Nottmeier and Lawson also held top positions in Chester as the Hospital Administrator and Director of Human Resources. In this context, Cowell asserts that their repeated, blanket denials of her accommodation requests qualified as a pattern of extreme, outrageous, and reckless conduct. She also contends that her resulting emotional distress qualified as sufficiently severe under Illinois law because she experienced continued physical symptoms, suffered permanent lung damage from contracting Covid-19 in unsafe working conditions, and lost some pay due to lack of sufficient benefit time.

Again, Defendant Klausing is not mentioned in Cowell's summary judgment response on Count IV. The record shows that Klausing left Cowell off of a meeting invitation three or four times. This is the only possible conduct the Court can readily identify related to Klausing. As a matter of law, this does not constitute extreme or outrageous behavior outside all bounds of decency. This action, even if deliberate, falls into a category of petty oppressions or other trivialities. Klausing did not hold a position of power over Cowell at this time either. As such, Cowell's claim against Klausing for intentional infliction of emotional distress fails.

Moving to Nottmeier and Lawson, Cowell's claim of intentional infliction of emotional distress also fails, even viewing the evidence in Cowell's favor. Denying

reasonable accommodation requests and taking away Cowell's state-issued cell phone (which was subsequently returned) objectively do not constitute extreme and outrageous behavior. Clearly, these actions do not show that Nottmeier or Lawson abused the power held over Cowell in a way far more severe than typical disagreements or job-related stress in the average work environment. The record shows Nottmeier and Lawson approved several of Cowell's requests, like the standing desk and a one time shift change in October 2020. If their denials of her other requests constituted extreme and outrageous conduct, any employee subject to an unfavorable workplace decision could raise an intentional infliction of emotional distress claim, which is obviously absurd.

Further, Cowell fails to demonstrate that she suffered severe emotional distress as a result of Nottmeier and Lawson's actions. Cowell only alleges symptoms stemming from her underlying physical disabilities. She claims to have suffered from physical symptoms (like long-term effects from contracting Covid-19 or prolonged back pain from not having a standing desk), but she does not connect those symptoms to *emotional* distress, which is necessary for this claim. The record fails to support a claim for intentional infliction of emotional distress against each individual defendant. Thus, Nottmeier, Lawson, and Klausing are entitled to summary judgment on Count IV.

## CONCLUSION

For these reasons, the Court **GRANTS in part and DENIES in part** Defendants' Motion for Summary Judgment (Doc. 119). The Court grants summary judgment on Counts I, III, and IV. Thus, the individual defendants—Travis Nottmeier, Jessica Lawson,

and Jamia Klausing—are dismissed from this action. Count II against Defendant IDHS will proceed to trial only for failure to accommodate (not ADA retaliation). Pursuant to the Court's Order of September 18, 2023 (Doc. 143), all pretrial deadlines will be reset given the resolution of this motion. The Court will set a status conference by separate order for the purpose of selecting a firm trial date and setting pretrial deadlines.

**IT IS SO ORDERED.**

**DATED:  February 12, 2024**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**